FILED

2012 May-29  AM 10:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **NORTH ALABAMA ELECTRIC COOPERATIVE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 10-S-3252-NE** |
| | ) | |
| **TENNESSEE VALLEY AUTHORITY,** | ) | |
| | ) | |
| **Defendants** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, North Alabama Electric Cooperative, commenced this action against defendant, Tennessee Valley Authority, alleging breach of contract and promissory fraud.[1]  Defendant moved for summary judgment on both claims.[2]  Plaintiff moved to strike a portion of defendant's evidentiary submission.[3]  Upon consideration of the motions, briefs, and evidentiary submissions, the court concludes that the motion for summary judgment is due to be granted, and the motion to strike is due to be denied as moot.

---

[1] Doc. no. 1 (Complaint).

[2] Doc. no. 21.

[3] Doc. no. 23.

# I.  LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).[4]  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "A genuine issue of material fact 'exists only if sufficient evidence is presented favoring the nonmoving party for a jury to return a verdict for that party.'"  *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999) (quoting *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1284-85 (11th Cir. 1997)).

"In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v.*

---

[4] Rule 56 was amended, effective December 1, 2010, in conjunction with a general overhaul of the Federal Rules of Civil Procedure.  The Advisory Committee was careful to note, however, that the changes "will not affect continuing development of the decisional law construing and applying these phrases."  Adv. Comm. Notes to Fed. R. Civ. P. 56 (2010 Amends.).  Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

*City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation."  *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921); s*ee also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II.  BACKGROUND

**A.     The Parties**

Defendant, Tennessee Valley Authority ("TVA"), is a corporate agency and instrumentality of the United States.  *See* 16 U.S.C. §§ 831-831ee.  TVA maintains and operates one of the nation's largest electrical power systems as part of its statutory mission for the development of the resources and economy of the Tennessee Valley

region.[5]  TVA sells the power it generates to local power distributors, which in turn

provide power to homes and businesses.[6]  There are 155 such distributors in the TVA

region.[7]  The five largest distributors service the metropolitan areas of Huntsville,

Alabama, and four Tennessee cities:  Chattanooga, Knoxville, Nashville, and

Memphis.[8]  Those so-called "Big Five" distributors have the greatest impact on the

policies of the Tennessee Valley Public Power Association ("TVPPA"), a consortium

of all of the distributors.[9]

The plaintiff, North Alabama Electrical Cooperative ("NAEC"), is one of the

regional power distributors associated with TVA.[10]  As a cooperative, NAEC is owned

by its members:  *i.e.*, the people and businesses to whom or which it sells electricity.[11]

NAEC distributes power to those portions of Jackson and Marshall Counties,

Alabama, that lie north of the Tennessee River.[12]  NAEC's service area is primarily

---

[5] Doc. no. 22 (Brief in Support of Summary Judgment), Defendant's Statement of Undisputed Facts ¶ 2.  Where factual assertions have not been disputed, the court will cite to the statements of those facts contained in the parties' briefs.

[6] *See* doc. no. 24 (Brief in Opposition to Summary Judgment), Plaintiff's Statement of Undisputed Facts ¶ 2.

[7] *See id.*

[8] *Id.* ¶ 28.

[9] Doc. no. 22-11 (Deposition of Bruce Purdy), at 60-61.

[10] Defendant's Statement of Undisputed Facts ¶ 4.

[11] Deposition of Bruce Purdy, at 18.

[12] Doc. no. 22-2 (Deposition of William Selby), at 19.

4

rural, and characterized by mountainous, rugged topography.[13]  Over the course of their 70-year relationship, TVA and NAEC have principally engaged in written contracts, but have also entered into several verbal agreements for the provision of services and equipment.[14]

## B.     The Department of Energy Grant

In February of 2009, shortly after the advent of the Obama Administration, Congress enacted the American Recovery and Reinvestment Act, Pub. L. No. 111-5, 123 Stat. 115 (Feb. 17, 2009).  Pursuant to that act, the Department of Energy ("DOE") announced the "Smart Grid Investment Grant" program ("SGIG").  Through that program, DOE offered to match the cost, up to $200 million, of projects designed to implement "smart" electric grids.[15]  A "smart" grid is a system that uses electric meters that can remotely transmit power-consumption data to the power distributor.[16] The use of a smart grid can help reduce total electricity usage and costs by providing the power distributor with realtime usage statistics, and providing the end user with information about the benefits of using power at low-demand times of day.[17]

---

[13] *Id.* at 21-22.

[14] *See* Plaintiff's Statement of Undisputed Facts ¶ 76.

[15] Defendant's Statement of Undisputed Facts ¶ 12.

[16] *Id.* ¶ 13.

[17] *See* Deposition of William Selby, at 127-28 (discussing the features of in-home displays).

### 1.    NAEC and SGIG

Prior to the announcement of the SGIG, NAEC had been using human meter readers to physically inspect the meter at each power endpoint.[18]   However, NAEC was beginning to explore other options for data collection.[19]   The terrain of the area serviced by NAEC eliminated the prospect of using certain smart grid technologies.[20]   When SGIG was announced, NAEC viewed it as an opportunity to gain funding for a smart grid.[21]   As a rural distributor relying on physical meter inspection, NAEC viewed itself as an ideal candidate for the SGIG program.[22]   NAEC General Manager Bruce Purdy hired David Thornell, an experienced grant writer, to write a proposal to submit to the DOE.[23]   The proposal deadline was August 6, 2009.[24]

### 2.    TVA and SGIG

Roughly one year before the announcement of the SGIG program, the TVA board of directors approved a goal of reducing energy usage by 1,400 megawatts over a four-year period.[25]   The board called for TVA to work with its power distributors to

---

[18] *Id.* at 47.

[19] *Id.*

[20] *Id.* at 54-57.

[21] Deposition of Bruce Purdy, at 102-03; Deposition of William Selby, at 52.

[22] Deposition of Bruce Purdy, at 102 ("It seems like it fits our territory to a tee . . . ."); *id.* at 170.

[23] Plaintiff's Statement of Undisputed Facts ¶ 12.

[24] Defendant's Statement of Undisputed Facts ¶ 14.

[25] *Id.* ¶ 6.

implement a "demand response" plan to meet that goal.[26]  TVA Executive Vice President of Customer Resources Ken Breeden drafted, and the TVA Board approved, a set of "Guiding Principles" for energy efficiency and demand response planning in May of 2008.[27]  Following the board's approval of the Guiding Principles, Breeden delegated contracting authority to three other TVA Vice Presidents.  Joe Hoagland and John Trawick were delegated authority to sign contracts related to energy efficiency and demand response agreements; Trawick and Ronald Owens were delegated authority to sign contracts related to TVA's distributors and end-users of power.[28]

TVA saw the SGIG as a potential source of funding for reaching its goal of reducing power usage and running a more efficient power distribution system.[29]  However, TVA determined that TVA, as a government entity, was not itself eligible to apply for grant funding.[30]  TVA turned to TVPPA to put together an "Alliance" of TVA distributors to apply jointly for a SGIG grant.[31]  Breeden tasked Mike Ingram,

---

[26] *Id.*  "Demand response" refers to the ability of a power company to tailor its output to the present needs of its customers.

[27] Doc. no. 22-4 (Declaration of Kenneth Breeden) ¶¶ 2, 4; *id.* at Ex. 1 (Request for Board Approval).

[28] *Id.* at Ex. 3 (Delegation of Authority Memorandum).

[29] *See id.* ¶ 7 ("Pursuant to my delegated authority and to help achieve the goal of a 1,400 megawatt reduction over four-years, [*sic*] I decided to work with TVA distributors and others to apply for grant funding made available by the American Recovery and Reinvestment Act . . . .").

[30] Plaintiff's Statement of Undisputed Facts ¶ 4.

[31] *Id.* ¶ 8.

7

Senior Manager of the Energy Efficiency and Demand Response group at TVA, with organizing the Alliance.[32]  Although Breeden placed Ingram in charge of the Alliance, he did not formally delegate any contracting authority to Ingram.[33]  TVA proposed to provide 25% of the funding for the projects included in the Alliance application, in addition to 50% to be provided by DOE.[34]  The goal was to put together an application for the SGIG maximum:  a total of $400 million, of which DOE would pay $200 million, TVA $100 million, and the individual distributors an aggregate of $100 million.[35]

## C.    NAEC is Convinced to Join the Alliance

### 1.    The TVPPA Alliance application

As the summer of 2009 wore on, the Alliance began to take shape.  The Alliance filed its letter of intent to apply for a SGIG grant on July 16, 2009.[36]  On the

---

[32] *Id.* ¶ 22.

[33] Declaration of Kenneth Breeden ¶ 8.  Breeden also stated that Ingram had no contracting authority.  *Id.*  Plaintiff moved to strike the portion of the declaration in which Breeden stated that Ingram did not have contracting authority, on the ground that it is a legal conclusion, not a fact.  Doc. no. 23.  However, even disregarding that statement, the court finds that Ingram lacked contracting authority.  Thus, the motion to strike is due to be denied as moot.

Plaintiff points to Ingram's testimony that, at a later time, he was "in the process of putting together proposals or rather contracts with the individual distributors" participating in a TVA grant program as evidence of Ingram's implied authority to contract.  Doc. no. 22-7 (Deposition of Michael Ingram), at 172.  However, "putting together" a contract for one project does not necessarily equate to the authority to consummate a contract for another.

[34] Doc. no. 22-5 (Deposition of Kenneth Breeden), at 52-53.

[35] *Id.*

[36] Plaintiff's Statement of Undisputed Facts ¶ 29.

same date, however, the Chattanooga distributor filed its own letter of intent, indicating that it would be filing a separate application with DOE.[37]  I was at that point in time that Ingram realized that the Alliance contained none of the Big Five distributors, and that it did not contain any Alabama distributors.[38]  Ingram decided to pursue another of the Big Five distributors.[39]  He was able to convince the Nashville distributor to join the Alliance on July 23, 2009.[40]  The Nashville distributor had asked whether it could submit an independent application contemporaneously with the Alliance application.[41]  Ingram thought that such an arrangement would jeopardize both applications, and convinced the Nashville distributor to abandon its solo application and file with the Alliance only.[42]

Ingram then turned his attention to courting NAEC to join the Alliance, because he felt it was important to have an Alabama distributor on board.[43]  Purdy had informed TVA employees on multiple prior occasions, however, that NAEC was

---

[37] *Id.* ¶ 30.

[38] *Id.* ¶ 34.

[39] Deposition of Michael Ingram, at 65-67.

[40] *Id.* at 78.

[41] *Id.* at 87.

[42] *Id.* at 87-88 ("I gave them my opinion that my understanding was that that would jeopardize both applications, their separate individual application and ours.").

[43] *See id.* at 67.

uninterested in joining the Alliance.[44]  Purdy had been convinced that NAEC was an ideal candidate for the SGIG grant when he first heard about the program in early 2009.[45]  Thus, he did not see much benefit to joining the Alliance.

In creating its individual application, NAEC had been focusing on smart grid technology that would cost roughly $3 million to implement.[46]  Another option, with more "bells and whistles," would have cost roughly $12 million.[47]  The more complex, $12 million smart grid system offered benefits to TVA that the simpler, $3 million system did not.[48]  Thus, TVA wanted NAEC to join the Alliance and pursue that

---

[44] *Cf.* Deposition of Bruce Purdy, at 145-46 (testifying that he explained to TVA employees that he had not changed his mind on the decision to join the application).

[45] *Id.* at 102, 170.

[46] *See* Defendant's Statement of Undisputed Facts ¶ 26.

[47] *See* Deposition of Bruce Purdy, at 109-11.

[48] Purdy testified that NAEC pursued the more complex system because it was what TVA wanted.

> Q:     You said the thing you needed, North Alabama needed[,] was give or take $3 million?
>
> A:     Correct.
>
> Q:     All the rest of it that has been called bells and whistles, was really to . . . satisfy TVA's interest [—] that's why you were being a team player?
>
> A:     Sure.
>
>        . . .
>
> Q:     And what was the . . . final price tag of your project that was submitted to DOE?
>
>        . . .

system.[49]  If the Alliance was awarded the grant, DOE would have provided $6 million, and TVA and NAEC would have provided $3 million each.[50]

### 2.    The July 27, 2009 conference call

With less than two weeks remaining before the SGIG application deadline, TVA made a final pitch to convince NAEC to join the Alliance, by means of a conference call conducted on July 27, 2009.  Four TVA employees participated in the call: Robbie Jones, Darrel Smith, Mike Ingram, and Karlton Fredebeil.[51]  Two NAEC employees were involved:  Bruce Purdy and William Selby.[52]  When TVA initiated the call, NAEC was still intent on declining to join the Alliance and filing its own

---

A:     It was 12 million.  . . .

Q:     Only 3 million of that . . . was your bread and butter, what you were really after?

A:     Correct.

Q:     The [other] 9 million was serving somebody else's purposes and as an offshoot yours as a team player?

A:     Correct, correct.

Deposition of Bruce Purdy, at 109-11 (bracketed alterations supplied).

[49] *See id.*

[50] *See id.* at 113.  Purdy apparently believed that TVA would actually pay the NAEC share as well.  *Id.* at 122 ("Q:  So if I'm understanding you correctly[,] for the $12 million project that you sent in with the TVPPA grant application, you assumed . . . that it was really going to be 6 and 6: 6 DOE and 6 TVA?  A:  Yes.") (bracketed alteration supplied).

[51] Defendant's Statement of Undisputed Facts ¶ 27.

[52] *Id.*

11

application.[53]  In the course of the conversation, Purdy asked whether NAEC could join the Alliance and still file its own application.[54]  Ingram explained that TVA believed dual applications would reduce the chances of either being granted, and said that the Nashville distributor had forsaken its own application to join the TVPPA Alliance.[55]

Ingram told Purdy that TVA had an assurance from Washington that, so long as the TVPPA application was timely submitted, it would receive grant money.[56] Ingram then provided Purdy further assurance.  Purdy testified that:

> Mike [Ingram] turns around and he says, ["L]ook, the $3 million, TVA will make good to you whether we win or lose.["]  That was a shocking statement.  And I recall saying, ["]Mike, let me make sure I understand you.  You are telling me whether or not our application wins the award, is granted the money or not, that you are going to give me the $3 million I was originally asking for regardless of the outcome[?"]  And Mike Ingram verifies and confirms that's what he said.[57]

Upon hearing that promise, Purdy decided that NAEC would join the Alliance.[58] NAEC was the twenty-third and final distributor to join the Alliance.[59]

Purdy testified that the thought that Ingram might not have the authority to

---

[53] Plaintiff's Statement of Undisputed Facts ¶ 49.

[54] Deposition of Michael Ingram, at 111-12.

[55] *Id.*

[56] Deposition of Bruce Purdy, at 149.

[57] *Id.* at 149-50 (bracketed alterations supplied).

[58] *Id.* at 150-51.

[59] Plaintiff's Statement of Undisputed Facts ¶ 51.

make an unconditional promise to pay NAEC $3 million crossed his mind "for a brief moment."[60]   However, he "quickly disposed of" his doubts "because every . . . path [he] tried to take [he] was led to Mike Ingram."[61]   He had "fallen under the impression that Mike Ingram had authority" and, moreover, felt that asking him if he had the authority to make that promise would have been a "[p]retty offensive comment."[62]

### 3.     The submission and denial of the Alliance application

The TVPPA Alliance timely submitted its SGIG proposal to DOE.[63] Concurrent with the submission of the application, TVA sent the distributors that were participating in the Alliance a letter outlining the proposed funding of the project.[64] In that letter, signed by Breeden, TVA listed the proposed contributions from DOE, TVA, and each distributor.[65]   The letter further stated that "the TVA management commitment set forth above is subject to the completion of appropriate contract arrangements among TVPPA, 'TVPPA Alliance' power distributors[,] and TVA for each phase of the Project . . . ."[66]   The Alliance learned that its grant application was

---

[60] Deposition of Brucy Purdy, at 161.

[61] *Id.* at 162 (bracketed alteration supplied).

[62] *Id.* at 162, 166 (bracketed alteration supplied).

[63] *See* Defendant's Statement of Undisputed Facts ¶ 41.

[64] Declaration of Kenneth Breeden, at Ex. 4 (Funding Letter).

[65] *Id.* at 1-2.

[66] *Id.* at 2 (bracketed alteration supplied).

denied by DOE on October 27, 2009.[67]  Despite Purdy's repeated demands that TVA

pay the $3 million promised by Ingram, NAEC never received those funds.[68]

## III.  DISCUSSION

### A.    Breach of Contract

"[C]ontracts to which TVA is an original party are governed by federal law."

*Stock Equipment Co. v. TVA*, 906 F.2d 583, 585 n.1 (11th Cir. 1990).  Four elements

are required to form a government contract:  "(1) mutuality of intent to contract, (2)

consideration, (3) lack of ambiguity in offer and acceptance, and (4) *actual authority*

*of the government representative to bind the government*."  *Secretary of the United*

*States Air Force v. Commemorative Air Force*, 585 F.3d 895, 900 (6th Cir. 2009)

(emphasis supplied).  For the purposes of its motion for summary judgment, defendant

argues only that the fourth element is unsatisfied.

Under the doctrine established in *Federal Crop Insurance Corp. v. Merrill*, 332

U.S. 380, 384 (1947), "it is well established that the federal government will not be

bound by agreement entered into by one of its agents unless the agent acts within his

actual authority."  *Prater v. United States*, 612 F.2d 157, 160 (5th Cir. 1980).[69]

---

[67] Plaintiff's Statement of Undisputed Facts ¶ 60.

[68] *Id.* ¶¶ 71-73.

[69] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

14

"Actual authority" generally requires that the government agent have *express* authority to bind the government.  However, "actual" authority can, under limited circumstances, be implied from the express authority an agent does have.  *See Strickland v. United States*, 382 F. Supp. 2d 1334, 1344 (M.D. Fla. 2005) (citing *Fifth Third Bank of Western Ohio v. United States*, 402 F.3d 1221, 1235 (Fed. Cir. 2005)). The uncontroverted evidence in the record shows that Ingram did not have express actual authority to bind TVA to contracts.[70]  However, plaintiff argues that Ingram had implied actual authority, based on his role in establishing the Alliance.

"A government agent's actual authority may be implied if contracting authority is an integral part of his assigned duties."  *Id.* (citing *H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed. Cir. 1989)).  Contracting authority is considered integral to an employee's duties if the employee "could not perform his or her assigned tasks without such authority and the relevant agency regulation does not grant such authority to other agency employees."  *Id.* (quoting *Leonardo v. United States*, 63 Fed. Cl. 552, 557 (2005)) (internal quotation marks omitted).  In *California Sand & Gravel, Inc. v. United States*, 22 Cl. Ct. 19 (1990), the Claims Court explained that the doctrine of implied actual authority is to be construed narrowly:

> [A] person with no actual authority may not gain actual authority

---

[70] Declaration of Kenneth Breeden ¶ 8.

through the court-made rule of implied actual authority. Specifically, the court may not substitute itself unconditionally for the executive in granting authority to an unauthorized person. The most the court can do is interpret the limited authority of an authorized person in a broader manner than ordinarily would be the case. As a predicate to a finding of implied actual authority, there must be, at the least, some limited, related authority upon which the court can "administer" the law so as not to ignore the policies and decisions of those persons charged with managing government programs. The court believes that *Landau* and the theory of implied actual authority is of limited application, and was not intended to repeal the long established rule that, when dealing with the government, only government agents with actual authority can make a contract, express or implied.

*Id.* at 27 (bracketed alteration supplied, citations omitted). Furthermore, when "an agency adopts internal procedures that preclude the employee from exercising such authority, it is totally inconsistent with the agency's actions to imply that the agency delegated or granted actual contracting authority. Hence, in such cases, the doctrine of implied actual authority should not apply." *Doe v. United States*, 58 Fed. Cl. 479, 485 (2003) (quoting *Cruz-Pagan v. United States*, 35 Fed. Cl. 59, 63 (1996) (internal quotation marks omitted)).

In *Strickland*, a marine mechanic sued the government to recover expenses he incurred in repairing a naval vessel. The employee alleged to have implied contracting authority had the duty of inspecting vessels to determine whether repairs were necessary. *Strickland*, 382 F. Supp. 2d 1344-45. He would then recommend repairs, subject to approval of others, who did have contracting authority. *Id.* at 1345.

16

The court stated that he "could independently verify the need for an expenditure without negotiating or agreeing to contractual terms therefor." *Id.* Citing *Doe*, the court ruled that the agent did not have implied contracting authority. *Id.*

Plaintiff argues that contracting authority was integral to Ingram's duties because, as the person in charge of the Alliance grant application, he was responsible for reaching agreements with distributors to join the organization. Plaintiff argues that, "if Ingram had the authority . . . to commit TVA to an award of matching funds if a DOE grant were awarded, he would . . . have the authority to make an unconditional commitment" to pay NAEC $3 million.[71] In other words, Ingram's authority to organize the application, which involved TVA and each distributor committing to work together and to pay for part of the project, was contracting authority. Without such authority, Ingram would not have been able to put together the Alliance application. Thus, it would certainly be integral to his duties.

Plaintiff's argument that some type of "contracting" authority was central to Ingram's duties, although logically appealing, does not satisfy the requirements of implied actual authority, as stated in cases such as *Strickland* and *Doe*. Ingram's role is somewhat analogous to that of the government agent in *Strickland*, in that he had the power to recommend expenditures to his superiors, but it was those superiors who

---

[71] Doc. no. 24, at 26.

actually had the authority to commit government funds.  The significant distinction between Ingram's duties and those at issue in *Strickland* is that Ingram did not simply report estimates to his superiors; rather, he was engaged in negotiation with the distributors.[72]   Ultimately, however, TVA "adopt[ed] internal procedures that preclude[d Ingram] from exercising [contracting] authority." *Doe*, 58 Fed. Cl. at 485 (bracketed alterations supplied).  That is, contracting authority for energy efficiency and demand response programs was specifically and reservedly delegated to three TVA Vice Presidents, but *not* to Ingram.[73]  It would be "totally inconsistent with the agency's actions to imply that the agency delegated or granted actual contracting authority" to Ingram.  *Id.*

Moreover, when the time came to put the proposed agreements between TVA and the power distributors in writing, it was *Breeden*, and not Ingram, who signed the letter.[74]  Finally, that letter expressly stated that the existing agreements would not be effective unless and until "appropriate contract arrangements" were made between the parties.[75]  In other words, the contracts that Ingram allegedly formed as part of his duties organizing the Alliance application were not commitments of TVA funds but,

---

[72] *See, e.g.*, Deposition of Michael Ingram, at 87-88 (testifying about his negotiation with the Nashville distributor).

[73] Declaration of Kenneth Breeden, at Ex. 3 (Delegation of Authority Memorandum).

[74] *Id.* at Ex. 4 (Funding Letter).

[75] Funding Letter, at 2.

18

rather, commitments to execute funding contracts, should the grant be awarded.  To infer from such commitments that Ingram had the authority to bind TVA to make an unconditional payment to NAEC would violate the "limited application" of the doctrine of implied actual authority, stretching it beyond its narrow bounds.  *See California Gravel & Sand*, 22 Cl. Ct. at 27.

**B.     Promissory Fraud**

**1.     Immunity from suit**

Although TVA generally is subject to suit, "courts have held that TVA cannot be subject to liability when engaged in certain governmental functions."  *Peoples National Bank of Huntsville, Alabama v. Meredith*, 812 F.2d 682, 685 (11th Cir. 1987) (citations omitted).  That so-called "nonliability" doctrine applies to discretionary governmental functions.  *Id.*  Almost every governmental action involves some choice; to satisfy the immunity requirement, TVA must have exercised judgment involving policy considerations.  *Id.* (citing *J.H. Rutter Rex Manufacturing Company, Inc. v. United States*, 515 F.2d 97 (5th Cir. 1975)).

The *Peoples Bank* case cited above arose out of contamination in the Wheeler National Wildlife Reservoir in or near Triana, Alabama.  *Id.* at 683.  Congress appropriated $1.5 million for TVA to address the pollution, but provided no further instructions as to how TVA was to use the funds.  *Id.*  TVA made loans to fishermen

whose livelihoods were affected by the pollution.  *Id.* at 684.  Litigation ensued, based on allegations that TVA officials had promised the fishermen that the "loans" would be shams:  *i.e.*, that the fishermen would be given money with no obligation to repay. *Id.* at 683-84.  The Eleventh Circuit held that the loan program was a discretionary function, and that TVA was immune from the fraud suit.  *Id.* at 685.  The court reached that conclusion because the Congressional appropriation did not involve "any directive as to program development."  *Id.*

Here, the function of organizing an Alliance to bid on DOE grant funds is arguably more discretionary than the aid program addressed in *Peoples Bank*.  The establishment of the SGIG program was not a Congressional directive to TVA.  In fact, TVA as an entity was not eligible to receive grant monies.  The decision to create an Alliance of distributors to pursue funding was TVA's policy decision to reduce power usage and increase efficiency.  In contrast, in *Peoples Bank* TVA was obligated to do *something* with the $1.5 million to help the fishermen.  Here, TVA was not obligated to anything with regard to the SGIG grant program.  Thus, any action undertaken by TVA was discretionary, and TVA is immune from suit.

### 2.    Merits of the promissory fraud claim

Plaintiff has offered no argument in response to defendant's immunity argument, focusing solely on the merits of its fraud claim.  Although immunity alone

is sufficient to dismiss the claim, summary judgment is also warranted on the merits of the claim.

Plaintiff's claim is one of promissory fraud:  *i.e.*, "one based upon a promise to act or not to act in the future."  *Southland Bank v. A&A Drywall Supply Co., Inc.*, 21 So. 3d 1196, 1211 (Ala. 2009) (internal quotation and citation omitted).  There are six elements to a promissory fraud claim:  (1) a false representation; (2) of a material existing fact; (3) reasonably relied on by plaintiff; (4) who suffered damages as a proximate consequence of the misrepresentation; (5) with proof that, at the time of the misrepresentation, the defendant had the present intention not to perform the future act required; and (6) proof that the defendant had the intent to deceive.  *See id.* Defendant argues that plaintiff has failed to satisfy the final four elements of a promissory fraud claim.  The court agrees that plaintiff has failed to demonstrate an intent to deceive, and will address that element only.

A plaintiff cannot meet its burden of showing intent to deceive merely on the basis that the promise was not kept.  *Wright v. AmSouth Bancorporation*, 320 F.3d 1198, 1204 (11th Cir. 2003) (applying Alabama law).  However, "intent to deceive can be established through circumstantial evidence that relates to events that occurred after the alleged misrepresentations were made."  *Vance v. Huff*, 568 So. 2d 745, 750 (Ala. 1990) (citation omitted).  In *Vance*, the Alabama Supreme Court affirmed

summary judgment, because there was no such circumstantial evidence in the record. *Id.*

In the present case, plaintiff has failed to produce evidence to support the intent to deceive element. Plaintiff argues that defendant's denials that Ingram made the promise, and that he had authority to make such a promise, somehow constitute circumstantial evidence that Ingram intended to deceive Purdy. Plaintiff makes the speculative argument that Ingram must have intended to deceive Purdy, because Ingram would have known that he did not have the authority to follow through on the promise. However, plaintiff's arguments suffer from flaws both logical and evidentiary.

First, the fact that Ingram lacked authority to make the promise does not preclude the possibility that he meant it sincerely. It is certainly within the realm of possibility that Ingram believed he had more authority than he actually did, or that he chose his words poorly. Either of those possibilities could result in a promise beyond the scope of his authority; neither implies an intent to deceive the listener. Of course, at the summary judgment stage, the court cannot speculate as to non-deceptive explanations for Ingram's conduct; it must construe the evidence in the light most favorable to plaintiff. And there arises the second flaw with plaintiff's argument; there is no evidence.

Plaintiff cites *Byrd v. Lamar*, 846 So. 2d 334 (Ala. 2002). *Byrd*, however, serves as a good example of what plaintiff has failed to do here. The *Byrd* plaintiff, a university student, brought suit alleging that his academic advisor fraudulently led him to believe that music classes would be available to him. *Id.* at 343-44. In reversing the trial court's grant of summary judgment, the Alabama Supreme Court pointed to the circumstantial evidence in the record. The sworn statement of another student indicated that the advisor told her that the school could not offer the music courses. *Id.* at 344. There also was testimony that the advisor told a colleague that he was lying to the plaintiff and the other student. *Id.* Finally, other faculty members told the plaintiff that the music program had been discontinued before he had even enrolled at the university. *Id.* at 345. Thus, there was significant circumstantial evidence in the record that the advisor knew that the courses were not available, and that he was intentionally misleading the plaintiff.

Those facts stand in stark contrast to the case at bar, in which the "evidence" of intent to deceive is plaintiff's flawed argument that if Ingram lacked authority, he *must* have known that he could not follow through on the promise. Plaintiff has failed to adduce any evidence that Ingram intended to deceive Purdy contemporaneously with his promise that TVA would pay NAEC $3 million even if the grant application was denied. Accordingly, summary judgment on the promissory fraud claim is

23

appropriate.

## IV.  CONCLUSION AND ORDERS

For the reasons stated herein, defendant's motion for summary judgment is GRANTED, and all of plaintiff's claims are DISMISSED with prejudice.  Plaintiff's motion to strike is DENIED as moot.  Costs are taxed to plaintiff.  The clerk is directed to close this file.

DONE and ORDERED this 29th day of May, 2012.

United States District Judge